**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

In re

NORTHPOINT COMMUNICATIONS GROUP, INC., NORTHPOINT COMMUNICATIONS OF VIRGINIA, INC., AND NORTHPOINT INTERNATIONAL, INC.,

    Debtor,

_____

DINA GAN, TRESSA JONES, TANJA WARNER, ERIC JAMES and BRANDON LANE, individually and on behalf of others similarly situated,

    Plaintiffs/Appellants

v.

E. LYNN SCHOENMANN, chapter 7 trustee successor to NorthPoint Communications, Inc., DOES 1-50

    Appellee.

No. C 04-03581 JSW

**ORDER RE: BANKRUPTCY APPEAL**

Now before the court is Appellant's appeal from the Judgment in favor of Appellee Northpoint Communications Group and the Order granting Appellee's Motion for Summary Judgment. Pursuant to Civil Local Rule 16-4, the case has been submitted on the papers without oral argument. Having carefully reviewed the administrative record and considered the parties' papers and the relevant authority, the Court hereby REVERSES and REMANDS to the Bankruptcy Court for further proceedings consistent with this Order.

**FACTUAL AND PROCEDURAL BACKGROUND**

Appellants bring this action pursuant to 29 U.S.C. § 2101 to obtain judicial review of a final decision of the Bankruptcy Court granting Appellee's motion for summary judgment and entering judgment in favor of Appellee. Appellants were employees of NorthPoint Communications Group (hereinafter "NorthPoint"), a Delaware corporation that provided high-speed, local data network services nationwide from its incorporation in March 1999, until March 2001.

On November 30, 2000, NorthPoint experienced a widely reported business setback when Verizon Communications, Inc. pulled out of a planned merger between the two companies. NorthPoint had expended substantial capital in reliance on the merger. As a result, Verizon's withdrawal left NorthPoint without the working capital to continue its operations. NorthPoint filed for Chapter 11 bankruptcy protection on January 16, 2001. On January 17, 2001, NorthPoint filed motions to fix procedures for the sale of substantially all of its assets and for post-petition financing. On March 22, 2001, NorthPoint informed the Bankruptcy Court that it was going to liquidate its assets. On March 28, 2001, NorthPoint announced that it was terminating its network and ceasing operation, which it did the following day. On March 30, 2001, NorthPoint laid off more than 700 employees.

Appellants, who were affected by the layoff, allege that NorthPoint violated the Worker Adjustment and Retraining Notification Act (hereinafter "WARN") by failing to provide its employees with written notice 60 days prior to the layoff that it was terminating their jobs. Appellants contend that NorthPoint was an "employer" governed by WARN when it conducted the layoff.

In issuing its ruling on the cross-motions for summary judgment, the Bankruptcy Court found that the historical facts were essentially uncontested. (Excerpt of Record on Appeal by Plaintiffs/Appellants ("Record") Exhibit 30, Certified Transcript of Record Proceedings, July 9, 2004 ("Tr.") at 3-4 (emphasis added).) The Bankruptcy Court also stated, with respect to the two motions filed shortly after the petition, that those motions:

> stated explicitly that the business would be sold, that the Debtor had insufficient cash to operate for more than 30 days without financing and 60 days with this financing, and the debtor was intending to operate pending the sale in the hope of *selling the business as a going concern and preserving the going-concern asset pending that sale*.

2

> A sale of assets, of some of the assets, was approved at a hearing on March 22nd. The Debtor had been unable to find any buyer willing to buy the business as a going concern and to keep the employees. Certain of the assets were sold; certain of the assets were not sold. The employees were laid off approximately one week later, which is more than 60 days after the petition date.

(Tr. at 3-4 (emphasis added).)

Upon these factual findings, the Bankruptcy Court determined as a matter of law that NorthPoint was not an "employer" subject to WARN at the time of the layoff. The Bankruptcy Court thus denied Appellant's motion for summary judgment granted Appellee's cross-motion for summary judgment and entered summary judgment in favor of NorthPoint.

## ANALYSIS

**A.  Standard of Review of Bankruptcy Court's Decision to Grant Summary Judgment.**

District courts have jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges. 28 U.S.C. § 158. A grant of summary judgment is reviewed de novo. *Halverson v. Skagit County*, 42 F.3d 1257, 1259 (9th Cir. 1994). In reviewing the Bankruptcy Court order, this Court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the Bankruptcy Court correctly applied the relevant substantive law. *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994).

**B.  NorthPoint Was an Employer Under WARN.**

The issue on appeal is whether NorthPoint was an "employer" and therefore subject to the notice requirement of WARN when it conducted its layoff. Subject to certain exceptions, WARN requires that "[a]n employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order."[1] 29 U.S.C. § 2102(a).

---

[1] WARN defines "mass layoff" as "a reduction in force which . . . results in an employment loss at the single site of employment during any 30-day period for: (i) At least 33 percent of the active employees, excluding part-time employees, and (ii) At least 50 employees, excluding part-time employees." 29 U.S.C. § 2102(a)  The parties do not dispute that NorthPoint conducted a "mass layoff," as defined by WARN, on March 30, 2001. Likewise, there is no contention that 60 days prior to the "mass layoff" NorthPoint provided written notice. Evidence in the record shows that on March 30, 2001 employees were given a letter informing its employees of the "mass layoff," which includes language that tracks the "faltering business" exception to WARN. (Record, Exhibit 25.)

3

"Employers" that violate these proscriptions become liable to affected employees for up to 60 days back pay. 29 U.S.C. § 2104(a)(1).

WARN defines an "employer" as "any business enterprise that employs . . . 100 or more employees." 29 U.S.C. § 2101(a)(1). Thus, in order to be an "employer," NorthPoint must both employ at least 100 people and be a "business enterprise."

It is uncontested that NorthPoint employed more than 100 employees. Therefore if NorthPoint was a "business enterprise" as defined by WARN, then it was an "employer."[2] Thus, to decide this dispute, the Court must decide whether the manner in which NorthPoint conducted its affairs rendered it a "business enterprise."

### 1. Prior Interpretations of "Business Enterprise."

Although the facts presented by Appellants appear to raise an issue of first impression, the Court is not without guidance in reaching its decision. The Ninth Circuit has interpreted the term "business enterprise" as follows:

> The simplicity of the definition emphasizes its apparent breadth. The plain language of the statute easily embraces *any* defendant who engages in a "business enterprise." In this regard, we think the crucial question [in determining whether an entity is a business enterprise] is not the status of the defendant's legal relationship to the business, but, instead, if at the time of the plant closing or mass layoff the defendant is responsible for operating the business as a going concern.

*Chauffeurs, Sales Drivers, Warehousemen & Helpers Union Local 572 v. Weslock Corp.*, 66 F.3d 241, 244 (9th Cir. 1995) (finding that a secured creditor operating in the "normal commercial sense" could qualify as a "business enterprise" under WARN, but finding that the particular creditor before the court was not a "business enterprise"). Thus, the *Chauffeurs* court appears to have used the terms "going concern" and "normal commercial sense" interchangeably to conclude that any entity operating as such should be considered a "business enterprise" for WARN purposes. The *Chauffeurs* court drew support for its interpretation from commentary appended to the Department of Labor's ("DOL") final regulations on WARN. That commentary provides:

---

[2] On filing for Chapter 11 bankruptcy, NorthPoint was operating its affairs as a debtor in possession. The parties do not dispute that there are circumstances under which a debtor in possession would constitute a "business enterprise" under § 2101(a)(1).

4

> [A] fiduciary whose sole function in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligations of the former employer because the fiduciary is not operating a "business enterprise" in the normal commercial sense. In other situations, where the fiduciary may continue to operate the business for the benefit of creditors, the fiduciary would succeed to the WARN obligations of the employer precisely because the fiduciary continues the business in operation.

54 Fed. Reg. 16045 (1989). Thus, if NorthPoint operated in the "normal commercial sense," or as a "going concern," then it was a "business enterprise," and thus an "employer" under WARN.

The Court also finds guidance in DOL commentary, which notes that:

> the term "employer" includes public and quasi-public entities which engage in business (i.e., take part in a commercial or industrial enterprise, supply a service or good on a mercantile basis, or provide independent management of public assets, raising revenue and making desired investments). . . .

20 C.F.R. § 639.3(a)(1)(ii). The parenthetical examples provide insight into what the DOL meant by "normal commercial sense" and suggest that the DOL believed that an entity that conducts these types of activities operates in the "normal commercial sense."

The Third Circuit has also interpreted the meaning of "business enterprise" in the bankruptcy context. *In re United Healthcare System, Inc*., 200 F.3d 170 (3rd Cir. 1999). Relying upon both excerpts from the DOL commentary cited above, as well as *Chauffeurs*, the court in *United Healthcare* stated that whether particular debtors in possession are "employers" should be resolved "in part on the nature and extent of the entity's business conduct and activities while in bankruptcy." *Id*. at 177. The *United Healthcare* court concluded that:

> The more closely the entity's activities resemble those of a business operating as a going concern, the more likely it is that the entity is an "employer;" the more closely the entity's activities resemble those of a business winding up its affairs, the more likely it is the entity is not subject to the WARN Act.

*Id.* at 179. While *United Healthcare* is not binding, because it is consistent with *Chauffeurs*, this Court finds it persuasive.

**2.   The Facts in This Case Support A Finding That NorthPoint Was Operating as A "Business Enterprise."**

5

*United Healthcare* makes clear that the Court should take into account "the debtor's economic activities *leading up to and during the bankruptcy proceedings*," when determining whether NorthPoint was an "business enterprise." *United Healthcare*, 200 F.3d at 179 (emphasis added). Although the Bankruptcy Court seemed to focus on events after March 22, 2001, this Court shall evaluate NorthPoint's activities prior to and following January 16, 2001, when NorthPoint filed for bankruptcy.

Upon entering bankruptcy, NorthPoint immediately sought to move towards selling its business as a going concern. NorthPoint stated as much through a Declaration by Michael Glinsky, NorthPoint's former Vice President and Chief Financial Officer, which was submitted to the Court with NorthPoint's Motion to Fix Procedures for Sale on the day after NorthPoint filed for bankruptcy.

> The Debtors believe that a "going-concern" sale of their business (the "Sale") is significantly preferable to a liquidation of their assets. In particular, the Debtors believe that creditors stand to gain significantly greater returns in the Sale than they would in a liquidation. In addition, the Debtors believe that (i) hundreds of jobs may be preserved through the Sale and (ii) the Sale would minimize the likelihood that DSL services would be interrupted for thousands of small businesses and residences. In a liquidation, on the other hand, the Debtors would be forced to terminate immediately their employees and discontinue DSL services to end-user residences and businesses.

(Record Exhibit 7, Declaration of Michael Glinsky, attached to Plaintiffs' Request to Take Judicial Notice (hereinafter "Glinsky Dec.") at ¶ 22.) In addition, NorthPoint sought and received financing in order to continue in operation as a going concern until it was sold.

In light of the Ninth Circuit's broad interpretation of "business enterprise" in *Chauffeurs*, as well as the analytical framework established in *United Healthcare*, these facts lean heavily in favor of concluding that NorthPoint was an "employer." NorthPoint itself distinguished its plan to continue as a going concern from the alternative of liquidating its assets. A plan to liquidate assets would certainly more closely resemble "a business winding up its affairs," as the business would cease to exist. In contrast, NorthPoint's intentions were to continue on as it always had while it sought out new owners who, after the sale, would maintain the business.

Examination of NorthPoint's activities while in bankruptcy further suggest that NorthPoint was an "employer." Until after the motion to liquidate NorthPoint's assets on March 22, 2001, the nature of the work that NorthPoint's employees engaged during NorthPoint's bankruptcy reflected no

6

change from their normal daily activities prior to NorthPoint filing for bankruptcy. Indeed, evidence in the record suggests that NorthPoint had its employees continue marketing and selling new service contracts to customers and develop its products. (*See e.g.*, Record, Exhibits 8-21 (Declarations by former NorthPoint employees).)

The facts here are quite distinguishable from the situation in *United Healthcare*, in which the Third Circuit held that because employees immediately shifted roles when the company filed for bankruptcy protection and began to prepare the company for liquidation, the company more closely resembled "a business winding up its affairs." *United Healthcare*, 200 F.3d at 178-179. In contrast, NorthPoint's activities in bankruptcy reveal that NorthPoint preserved its company as a profitable business, albeit one for sale.

The Bankruptcy Court relied heavily on NorthPoint's intended disposition in concluding that NorthPoint was an employer. (Tr. 6.) Appellants have argued that *United Healthcare* demands that the Court's focus should rest on the activities of the entity while in bankruptcy and that the Bankruptcy Court was improperly focused on NorthPoint's intent in reaching its decision.

*United Healthcare* does emphasize the activities of an entity while in bankruptcy. Nevertheless, a thorough reading of the case reveals that the court found that intent was important to the determination of whether an entity is a "business enterprise." The court stated that "United Healthcare's actions from the time it filed its Chapter 11 petition throughout the proceedings clearly demonstrate its intent to liquidate." *United Healthcare*, 200 F.3d at 178. This statement indicates that the court believed that an entity's activities were essential to its determination precisely because they provide insight into the entity's intent. Thus, this Court believes that the Bankruptcy Court was correct in looking to NorthPoint's intended disposition in assessing whether it was an "employer" under WARN.

Nevertheless, this Court comes to a different conclusion than the Bankruptcy Court. NorthPoint's intended disposition during the majority of its bankruptcy proceedings more closely resembled that of "a business operating as a going concern" than "a business winding up its affairs." First, the DOL commentary discussed in *Chauffeurs* supports a finding that NorthPoint was an "operating as a going concern." The comments state that an entity that "continue[s] to operate the

7

business for the benefit of creditors" succeeds to the notice requirements of WARN. 54 Fed. Reg. 16045 (1989). NorthPoint was a debtor in possession attempting to sell its company as an operational business for the benefit of its creditors.[3] Mr. Glinsky's Declaration explicitly speaks of the benefit NorthPoint's creditors will receive from selling the company as a going concern, rather than liquidating its assets. (Glinsky Dec. ¶ 22.) Thus, the Court concludes NorthPoint is the type of entity that WARN was intended to cover.

In addition, it is fair to infer from 20 C.F.R. § 693.3(a)(1)(ii), discussed above, that when entities "take part in a commercial or industrial enterprise, [or] supply a service or good on a mercantile basis," they operate in the "normal commercial sense" and are "employers." Thus, the fact that NorthPoint continued to market and sell its goods places it squarely within the DOL's vision of "employers."

The Bankruptcy Court, however, believed that there was strong policy weighing against subjecting entities in bankruptcy to heightened liability should they attempt to sell their businesses as functional concerns.

> I think it would be very bad policy to burden the fiduciary or to restrict the fiduciary in how the fiduciary could liquidate and imposing . . . the WARN Act restrictions on a fiduciary trying to liquidate a business would discourage the fiduciary from trying to sell an enterprise as a going concern value. I think that would diminish the value of the sale. It would also decrease the likelihood that somebody would buy the business as a going concern and keep the jobs and in some ways would undercut the very purposes of the Act.

(Tr. 6-7). The Bankruptcy Court's economic concerns are surely valid. Nevertheless, protecting economic efficiency in the sale of bankrupt companies is not at the heart of WARN's purposes.[4] Additionally, the Bankruptcy Court's concerns over job losses are consistent with the general spirit of WARN. Nonetheless, preventing unemployment was not the precise purpose of the WARN Act.

---

[3] A debtor-in-possession is a fiduciary for its estate and for its creditors. *See* 11 U.S.C. § 1107(a).

[4] Nevertheless, the DOL did consider the fact that employers may face difficult decisions regarding whether to give notice to its employees in ambiguous situations. 20 C.F.R. § 639.1(e). The DOL commented that employers would be well served to consider the relative costs of giving notice and having to pay its employees 60 days wages and benefits in deciding whether to give notice. *Id.* While the DOL's comments are only hortatory, or at most precatory, the DOL stated that "[g]iven the relative costs involved, the employer is best advised to give notice unless it is *certain, at the time it must decide to give notice*, that there is no possibility of [being subject to WARN's notification requirements]." 54 Fed.Reg 16042 (emphasis in original).

Rather, the purpose of WARN is to provide "protection to workers, their families and communities by requiring employers to provide notification." 20 C.F.R. § 639.1(a) (2005).

Subjecting NorthPoint to WARN's notice requirement does comport with the public policy underlying WARN. The notice requirement was intended to give workers "some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining." 20 C.F.R. § 639.1(a). *See also United Healthcare*, 200 F.3d at 178 (quoting *Hotel Employees and Restaurant Employees Int'l Union Local 54 v. Elsinore Shore Associates*, 173 F.3d 175, 182 (3rd Cir. 1999) (environment of an unstable job market caused by mergers and closures of numerous businesses, WARN was adopted to protect workers through providing them fair notice).

Further, employers are not relieved from WARN's notification requirements even after a company announces it will be sold. Rather, WARN expressly provides that an employer maintains liability to its employees until the effective time of sale of its company:

> In the case of a sale of part or all of an employer's business, the seller shall be responsible for providing notice for any plant closing or mass layoff in accordance with section 3 of this Act [29 U.S.C. § 2102], up to and including the effective date of the sale.

29 U.S.C. § 2101(b)(1) (2005). The foregoing indicates that Congress, while accepting unemployment as inevitable, intended that employees not bear the burden of major workforce cuts without sufficient notice with which to plan. Under WARN, this burden was allocated instead to employers which were assumed to be in position to anticipate the need for such cuts.

The record is clear that NorthPoint entered bankruptcy proceedings publicizing its intention to secure a sale of all its assets as a going concern, which would have eliminated the need for a mass layoff. (Glinsky Dec. at ¶ 22.) NorthPoint made such representations not only to the Bankruptcy Court, but also its employees. (*See e.g.*, Record, Exhibit 19, Declaration of Ramon Garcia at 2-3.) Indeed, NorthPoint espoused the retention of hundreds of jobs as one of the reasons that selling the company as a going concern was preferable to liquidating its assets. (Glinsky Dec. at ¶ 22.)

At the same time, NorthPoint knew upon entering bankruptcy that it could only continue in operation for around 60 days if it could not find a buyer. (Glinsky Dec. at ¶ 25.) Because NorthPoint

expected that after a sale it would continue to operate indefinitely; however, it provided no indication to its employees that their positions were in jeopardy. (*See, e.g.*, Record, Exhibits 8-21.) Rather, at the outset of its bankruptcy proceedings, NorthPoint expressed confidence that it would receive bids for such a sale, doubtless inspiring confidence in its employees that their jobs would be safe. (Glinsky Dec. at ¶ 22.) WARN was crafted precisely for the purpose of preventing employees from suffering harm due to such reliance. Thus, it is consistent with WARN's purposes to place the burden of complications resulting from the attempted sale of the company as a going concern on NorthPoint.

For the foregoing reasons, the Court concludes based upon the record that NorthPoint operated as a "business enterprise" and therefore was an "employer," for purposes of WARN.

## CONCLUSION

For the forgoing reasons, the Court hereby VACATES the judgment entered against Plaintiffs/Appellants and REVERSES the Bankruptcy Court's grant of Summary Judgment for Appellees/Defendants. The Court REMANDS this case to the Bankruptcy Court for further proceedings consistent with this Order.

The Clerk is directed to close the file.

**IT IS SO ORDERED.**

Dated: May 6, 2005

     /s/ Jeffrey S. White
     JEFFREY S. WHITE
     UNITED STATES DISTRICT JUDGE